**LINDEMANN LAW FIRM, APC**
BLAKE J. LINDEMANN, SBN 255747
433 N. Camden Drive, 4th Floor
Beverly Hills, CA 90210
Telephone: (310)-279-5269
Facsimile: (310)-300-0267
E-mail: blake@lawbl.com

Attorneys For Plaintiffs
HELEN XIONG AND THOSE
SIMILARLY SITUATED

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA, SOUTHERN DIVISION

|  |  |
|---|---|
| HELEN XIONG aka Huiqin Xiong, an individual; on behalf of herself and those similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>JEUNESSE GLOBAL, LLC dba JEUNESSE, LLC; KIM HUI, an individual; and DOES 1-10,<br><br>Defendants. | Case No:<br><br>**ORIGINAL COMPLAINT – CLASS ACTION**<br><br>**[DEMAND FOR JURY TRIAL]** |

I. **INTRODUCTION TO THE CASE**

1. Jeunesse represented to Plaintiff Helen Xiong and other California employees (collectively, the "Plaintiffs") that they could make "streams of income" and "wealth," by recruiting others to become Jeunesse distributors.

2. Plaintiffs and the class all purchased Jeunesse inventory and became distributors. Plaintiff put in significant effort into selling the Jeunesse opportunity but failed.

3. Plaintiff did <u>not</u> make money as promised. Like the thousands of Jeunesse distributors before and after, Plaintiff failed. She failed even though she was committed and put in the time and effort. She failed because she was doomed from the start by a Jeunesse marketing plan that systematically rewards recruiting distributors over retail sales of product.

4. Defendants run an illegal pyramid scheme. They take money in return for the right to sell products and the right rewards for recruiting other participants into the pyramid.

5. Accordingly, Plaintiffs, for themselves, all others similarly situated, and the general public, allege:

II. **TYPE OF ACTION**

6. Plaintiffs sue for themselves and for all persons who were California participants from August 10, 2014 until the present under California's Endless Chain Scheme Law (California's Penal Code § 327 and California Civil Code § 1689.2), California's Unfair Competition Law (Business and Professions Code §17200 *et. seq.*); False Advertising Law (Business and Professions Code §17500), fraudulent inducement, and Unjust Enrichment. The class Plaintiffs are seeking to represent does not include any person outside of the State of California.

III. **PARTIES**

7. Plaintiff Helen Xiong aka Huiqin Xiong became a participant in Defendants' endless chain when certain products were shipped by Jeunesse to her on

August 10, 2015. Upon information and belief, and best records, Plaintiff Xiong paid Defendants approximately $10,000 to the Defendants as part of the scheme.

8. Jeunesse is a Florida limited liability company, with its principal place of business located 650 Douglas Avenue, Suite 1010, Altamonte Springs, Florida 32714. Jeunesse commenced operations in 2009. Jeunesse purports to provide a catalogue of alleged "youth enhancing" skin care products and dietary supplements it pedals as part of its distributorships.

9. Kim Hui is a resident of Orange County, California and Double Diamond Director in Jeunesse.

10. Upon information and belief, approximately 1/3 of Jeunuesse's sales occur in the State of California.

IV. **JURISDICTION AND VENUE**

11. Jurisdiction is conferred upon this Court because Defendants do business in this judicial district, they hold themselves out and market to this jurisdiction, and they actually conduct significant transactions in this jurisdiction.

12. Venue is proper in this Court because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred here, a substantial part of the property that is the subject of this action is situated here, and Defendants are subject to personal jurisdiction, in this District.

13. Defendant Jeunesse is subject to the jurisdiction of this Court. Jeunesse has been engaged in continuous and systematic business in California. In fact, most of Jeunesse's distributions originate from California.

14. Jeunesse has committed tortious acts in this State.

15. Each of the Defendants named herein acted as a co-conspirator, single enterprise, joint venture, co-conspirator, or alter ego of, or for, the other Defendants with respect to the acts, omissions, violations, representations, and common course of conduct alleged herein, and ratified said conduct, aided and abetted, or is other liable. Defendants have agreements with each other, and other unnamed Diamond

Director co-conspirators and have reached agreements to market and promote the Jeunesse Pyramid as alleged herein.

16.     Defendants, along with unnamed Diamond Director co-conspirators, were part of the leadership team that participated with Jeunesse, and made decisions regarding: products, services, marketing strategy, compensation plans (both public and secret), incentives, contests and other matters. In addition, Defendants and unnamed co-conspirators were directly and actively involved in decisions to develop and amend the distributor agreements and compensation plans.

17.     Plaintiff is presently unaware of the true identities and capacities of fictitiously named Defendants designated as DOES 1 through 10, but will amend this complaint or any subsequent pleading when their identities and capacities have been ascertained according to proof. On information and belief, each and every DOE defendant is in some manner responsible for the acts and conduct of the other Defendants herein, and each DOE was, and is, responsible for the injuries, damages, and harm incurred by Plaintiffs. Each reference in this complaint to "defendant," "defendants," or a specifically named defendant, refers also to all of the named defendants and those unknown parties sued under fictitious names.

18.     Plaintiff is informed and believes and thereon allege that, at all times relevant hereto, all of the defendants together were members of a single association, with each member exercising control over the operations of the association. Each reference in this complaint to "defendant," "defendants," or a specifically named defendant, refers also to the above-referenced unincorporated association as a jural entity and each defendant herein is sued in its additional capacity as an active and participating member thereof. Based upon the allegations set forth in this Complaint, fairness requires the association of defendants to be recognized as a legal entity, as the association has violated Plaintiffs and Class Members' legal rights. *See e.g.*, *Coscarart v. Major League Baseball*, 1996 WL 400988 at *22 (N.D. Cal. 1996).

19.    Plaintiff is further informed and believe and thereon allege that each and all of the acts herein alleged as to each defendant was authorized and directed by the remaining defendants, who ratified, adopted, condoned and approved said acts with full knowledge of the consequences thereof, and memorialized the authority of the agent in a writing subscribed by the principal.

20.    Plaintiff is informed and believe and thereon allege that each of the defendants herein agreed among each other to commit the unlawful acts (or acts by unlawful means) described in this Complaint.

21.    The desired effect of the conspiracy was to defraud and otherwise deprive Plaintiffs and Class Members (as hereinafter defined) of their constitutionally protected rights to property, and of their rights under other laws as set forth herein. Each of the defendants herein committed an act in furtherance of the agreement. Injury was caused to the Plaintiffs and Class Members by the defendants as a consequence.

## V.    **EMPLOYMENT ALLEGATIONS**

22.    Plaintiff Xiong is informed and believes, and thereon alleges that Jeunesse uniformly misclassifies all of its representatives as independent contractors when they are, in fact, employees.

23.    Jeunesse exerts significant control over its representatives. For example, representatives must adhere to rules regarding the their conduct, their sales pitches, their performance, and the method by which they complete sales.

24.    As a result of the misclassification, Jeunesse failed to provide Plaintiff Xiong and other aggrieved employees with itemized wage statements, minimum and overtime wages, lawful meal or rest periods, and reimbursement for necessary expenses. Jeunesse also failed to keep accurate payroll records showing aggrieved employees' hours worked and wages paid.

25.    Plaintiff Xiong further alleges that Jeunesse violated PAGA in the following ways: (1) Jeunesse has failed to provide prompt payment of wages to

representative employees upon termination and resignation in violation of Labor Code §§ 201, 202, 203; (2) Jeunesse has failed to provide itemized wage statements to representative employees in violation of Labor Code §§ 226(a), 1174, and 1174.5; (3) Jeunesse has failed to provide meal and rest periods in violation of Wage Order No. 9 and Labor Code §§ 226.7, 512, and 558; (4) Jeunesse has willfully misclassified its representative employees in violation of Labor Code § 226.8; (5) Jeunesse has retained portions of monies intended for representative employees in violation of Labor Code § 351; (6) Jeunesse has failed to keep required payroll records in violation of Wage Order No. 9 and Labor Code §§ 1174 and 1174.5; (7) Jeunesse has failed to pay overtime wages in violation of Wage Order No. 9 and Labor Code §§ 510, 558, 1194 and 1198; (8) Jeunesse has failed to pay minimum wages in violation of Wage Order No. 9 and Labor Code §§ 1182.12, 1194, and 1197; (9) Jeunesse has failed to reimburse representative employees for all reasonably necessary expenditures and losses incurred by representative employees in direct consequence of the discharge of their duties, including but not limited to commissions, travel costs, product costs, shipping costs, and other costs incurred in the sale of travel packages, in violation of Labor Code § 2802.

VI. **FACTS**

  **A. Overview Of Jeunesse' Pyramid Scheme**

  26. As of 2015, More than 50 complaints have been filed with the Federal Trade Commission ("FTC") and the Florida Attorney General's office regarding Jeunesse. The vast majority of the complaints concern problems with obtaining refunds, and claims that Jeunesse is a pyramid and/or ponzi scheme.

  27. Some time in 2015, TruthInAdvertising.org conducted an investigation into Jeunesse's business practices and filed its own complaint with the FTC.

  28. Rewards paid in the form of cash bonuses, where primarily earned for recruitment, as opposed to merchandise sales to consumers, constitute a fraudulent business model. *See F.T.C. v. BurnLounge, Inc.*, 753 F.3d 878 (9th Cir. 2014).

29.    Jeunesse admitted through its top-earning distributorships, that its method of operation constitutes a pyramid scheme.

30.    One of the top and senior distributors, Defendant Kim Hui of Newport Beach, is estimated to be earning over $6 million a year from Jeunesse from "commission" – amounts earned from distributors signed up below her on the tall pyramid Defendants have constructed.

31.    According to Hui in a video published online, success in Jeunesse is all about recruitment:

> *So first thing we've got to do is go out there and recruit . . . We're building a distribution channel if you would and so what we do – the first thing we do is recruit. What do we recruit? We recruit entrepreneurs . . . . And the second thing we do is that we teach other people how to recruit because this business is all about duplication.* ***It's not about one person selling all the time cause that's linear income, you know, trading time for money. But this business model is about building distribution and about creating wealth*** *. . . And then the third thing we do is teach other people on how to teach other people and so that's when true duplication happens . . . With wealth, with the money would be – we are paid to build our distribution network.*

32.    Hui, in discussing Jeunesse's bonus structure, further states:

> *So the first way to make money is retail commissions, right. You know we as distributors we get the product at wholesale and then when people buy it, they buy it retail . . .* ***so we get a little retail commission****. . . .* ***Now that will be the smallest pay you ever get****. OK? I forget about retail commissions for me. . . .* ***I'm in this not to sell product. I'm here to build a global distribution****. . . . I'm not a salesperson; I'm a business builder.* (emphasis added).

33.    Similar to these public statements, Plaintiffs and the Class were informed that the most important function of the business was building a network of

distributors and paying their monthly commissions through the pyramid scheme, in other words, sales of the product were of no relevance.

34. Further evidencing the nature of Defendants' pyramid scheme and the ponzi scheme, Jeunesse's inventory is regularly and systematically re-sold by distributors on Amazon.com™ for less than the wholesale prices distributors can sell the product for. Based on a common understanding of the marketplace, a normal class member cannot earn any retail profit off the sales side of products because one of the largest seller of consumer goods in the United States, Amazon.com, offers "cheaper" prices than a Jeunesse distributor. And this sale at prices "lower than wholesale" price also shows sales of the products are not a motivating factor in leading distributors to sign up. Distributors make profit from the commissions each distributor below on their downline charges, that they will sell Jeunesse's products at a loss based on what the distributors have paid.

35. Jeunesse also has significant variance in its suggested retail of between $45 to almost $300 (the suggested retail price at most times) during the class period. This range reflects nearly no potential for profit if a distributor sells product at the "lower end" of the range, further symbolizing that the business is propagated, and held up by commissions of persons on the lower level of the pyramid. Particularly in the Chinese-American community, Jeunesse encourages Chinese to sell at wholesale price and to take advantage merely of the "commissions" paid by down-stream distributors.

36. Defendants also create a more expensive "starter" package to "jump-start their business by purchase a product package, which ranges in price from about $200 to $1,800. This purportedly allows "newbies" to catapult to higher levels of compensation on their commissions, i.e. they receive a larger percentage of the commission for those persons below them on the pyramid scheme by paying the unconscionable mount of $1,800. This package prevailed at many times during the

class period. The maximum "start-up" package has now been reduced by Jeunesse from $1,800 to $1,000.

37. All Class Members and Plaintiff is required to purchase a mandatory starter kit for $49.95, with a $19.95 renewal fee, the requirement to purchase at least $100 per month of product to remain qualified for all commission and bonuses. Should a distributor not purchase $100, the commissions of all those below them on the pyramid they would have been entitled to, are forfeited.

38. During nearly the entire Class Period (as later defined), Jeunesse did not make an income disclosure statement to its distributors or prospective distributors, particularly during nearly the entire time that Plaintiff was a distributor for Jeunesse.

39. Instead, Jeunesse made the following representations to the Class Members and Plaintiff with no supporting information:

"Jeunesse Is paying us over a million a year!"

"$2,000, $3,000, $10,000, $20,000, $50,000, $100,000 – you can do it with Jeunesse."

"It's a proven plan. With as many as six streams of income. People are making $26,250 a week – a week. Think of what you could do with that."

"Average diamond in Jeunesse makes over a million dollars a year. I hit diamond right after my year marker in Jeunesse. And this is life changing."

40. These statements are deceptive income claims regarding the financial gains consumers will achieve by becoming distributors. For example, Jeunesse advertises that those who sign-up for its business opportunity can make over $26,000 per week. Its distributors also make unrealistic financial promises, such as being able to make millions of dollars per year.

41.     Even when Jeunesse did finally make income statement disclosures to some Class Members in late 2015 ("Income Disclosures"), the statement was confusing, misleading, and false as follows:

a.     The Income Disclosures provided that 98% of the distributors of Jeunesse (over 500,000 distributorships) gross less than $5,500 per year;

b.     The highest earning distributorships, the top of the pyramid scheme, earn a majority of revenues from the scheme;

c.     The Income Disclosures are confusing because they are ambiguous as to whether it captures data for the U.S. only, or culls income figures on a global level;

d.     The Income Disclosures fail to state the period or term by which the income is measured, *i.e.* one year, two-years, and is thus, misleading;

e.     The Income Disclosures fail to define material terms such as "Avg high Gross Earnings/month" and "Avg Low Gross Earnings/month";

f.     The Income Disclosures fail to define a "distributor";

g.     Finally, the Income Disclosures are incorrect. The median is higher numerically than the average of the "high income" persons, evidencing that the numbers are either erroneous or fabricated.

42.     Further evidencing the pyramid scheme, the "products" Jeunesse offers are a complete scam and do not provide any of the benefits as represented. Specifically, all four of the doctors on the board of Jeunesse claim that some Jeunesse products can literally manipulate human genes and cells, even going so far as to say that Jeunesse products can actually slow the aging process and cure cancer. At Jeunesse's 2015 Singapore convention, here's what its physician team had to say: *Vincent Giampapa, M.D.*: "prevention and restoration and regeneration . . . our products are really designed to not only treat aging but to help prevent it and slow it at these early ages." (at 4:33) Dr. Giampapa goes on to say, "One of the key focuses of AM PM was to really look at how do we actually manipulate that gene clock but

in a natural way. And what we found out . . . is . . . plant extracts, herbs, enzymes – if they're the right combinations of things can actually turn off certain of these genes this that are negative aging genes and turn back on, for instance, genes that help keep us healthy and young. So . . . AM PM we frequently refer that product as a vitamin mineral supplement and in reality it's the next evolution beyond vitamin and minerals." (at 10:29) *William Amzallag, M.D.*: "Reserve . . . it will balance oxidation and anti-oxidation because as you know we have to balance . . . so this is the first goal of Reserve. The second goal of Reserve is to switch on a very specific gene which is called survival gene." (at 13:50) *Donna Antarr, M.D.*: "With Zen Bodi, we created a system that works with the body . . . that enables the body to actually rejuvenate and recover on a cellular level." (at 23:40) *Nathan Newman, M.D.*: "when we are putting these products on our body or taking them by mouth, we're really changing every cell in the body just like Dr. Giampapa said, we're changing one cell at a time, we're effecting them and that effect is/has a domino effect and it goes much further than the one place that we treat or what product that we take." (at 36:20).

B.     **The Public And Private Compensation Business Operations Constitute A Pyramid Scheme**

43.     In addition to the "public" compensation plan generally described above, Jeunesse has a private compensation plan involving secret, undisclosed backroom deals offered to those believed to be "quality" recruits, typically top earners in other network marketing companies with established downline (the "Off-Book Plan"). Both compensation plans further Jeunesse's operation of an illegal pyramid scheme because both plans revolve around recruitment. A distributor's compensation is derived from successfully recruiting new distributors (not product sales to ultimate end users), or as in the case of the undisclosed, Secret

Compensation Plan, luring and importing entire downlines or "teams" from other network marketing companies.

44.     Defendants have operated and promoted their fraudulent schemes through the United States through the use of the U.S. mail and interstate wire communications, e-mail, fax, and other methods of communication. Through their creation and operation of their pyramid scheme, Defendants intended to, and did in fact, defraud their distributors – including Plaintiffs and the Class Members.

45.     In reality, few of Jeunesse's products are ever sold to anyone other than its Distributors. Because its Distributors are the actual customers and ultimate users of its products, Jeunuesse requires an ever-expanding network of new Distributors in order to keep the pyramid scheme running.

46.     Under the public compensation plan, Distributors earn income from a) bonuses for recruiting and sponsoring new representatives, and b) commissions from sales of products and services to themselves and to the recruit in their downline include a 20% Check match on all commissions received by personally sponsored distributors.

47.     Jeunesse's message, at all times, has been centered around a recruitment driven message, in which a Distributor's compensation derives from successful recruitment of new distributors. All of the exorbitant costs are paid in order to stay "active" and "qualified, which is necessary to be compensated under the scheme.

48.     Because Jeunesse's Distributors essentially do not sell products to consumers (who are not also distributors), they only obtain return on their investment by recruiting new distributors (who then buy products).

49.     This results in payouts alleged to be "bonuses" and "commissions"

50.     Jeunesse's emphasis on selling product packages to recruits is not based upon real consumer demand for its products but instead by the new recruit's

desire to earn greater commissions and bonuses under the Jeunesse Public Compensation Plan.

51. When a Jeunesse distributor recruits a new individual in his or her downline, and the new individual "activates" by purchasing a Jeunesse product package, the distributor who enrolled the new individual into his downline receives a "Customer Acquisition Bonus" ranging from $25 to $250, depending on the price of the produce package purchased.

52. When a Jeunesse distributor recurs a new distributor who purchase a product package, the following recruitment commissions are paid out:

- Basic Package ($199.95)- $25 commission
- Supreme Package ($499.95) - $100 commission
- Jumbo Package ($799.95) - $200 commission;
- 1-Year Jumbo Package ($1799.95) - $200 commission
- Ambassador Package ($1099.95) - $250 commission

53. These bonuses are paid regardless of whether any Jeunesse product is sold to ultimate end-users outside the distribution channel. As one Jeuness recruitment video states: "These bonuses are paid when you introduce a new distributor who goes on to purchase one of the Jeunesse product packages when they get started."

54. Jeunesse does not provide adequate, if any, "safeguard" policies and procedures sufficient to ensure adequate product sales to ultimate end users and to prevent inventory loading. Such safeguards are necessary, as a structure with insufficient retail sales will inevitably generate a pyramid scheme that relies on ongoing recruitment to fund commission payments.

55. Jeunesse has a 70% rule within its Policies & Procedures. It states: "In order to qualify for commission and overrides, each distributor must certify with the purchase of product that he/she has sold to retail customers and/or has consumed

seventy percent (70%) of all products previously purchased. This is known in the industry as the 'Seventy Percent Rule'."

56. Jeunesse's Seventy Percent Rule depends entirely on self-verification and there are no explicit sanctions for a violation. Even if Jeunesse were to take steps to verify this certification, a distributor could meet the terms of the Policy and Procedures by merely consuming the product personally, even if the purchase was motivated by the desire to earn commissions. As such, even if enforced, this rule would not be effective to ensure product sales to individuals outside the distribution network.

57. Jeunesse also has no Jeunesse-like "10 Customer Rule" or similar policy. Jeunesse does not even require that a distributor make any product sales to ultimate consumers outside the distribution channel. Pursuant to the Jeunesse Policies & Procedures: "In order to qualify for any compensation payable under the Jeunesse Rewards plan, a distributor should make retail sales to the ultimate consumer."

58. Jeunesse has a 1-year return policy for distributors who leave the business. The ability to return product, however, is limited by potential expiration of the product (the product must be in "CURRENT, REUSABLE AND RESALABLE condition") and, more significantly, by the 70% certification assumed in every distributor's purchase. If the purchase itself certifies that 70% will be sold.

59. Upon information and belief, recipients of such deals include Jeunesse top earners Defendants Kim Hui.

60. Jeunesse also recommends its Chinese distributors to transfer products out of Hong Kong to avoid and flout Chinese laws concerning imports from countries such as the United States. Thus, Jeunesse encourages its distributors to violate laws of other countries.

61. Jeunesse was not complying with China's direct selling and anti-pyramid selling regulations. In fact, quite the opposite - Defendants were permitting

the establishment of downlines in China in direct violation of China's rules prohibiting multi-level marketing. Moreover, Defendants knowingly failed to put in place a system of internal controls that would have ensured that new sales representatives and direct sellers were trained in a way that complied with Chinese law. The training that did exist was lax and inconsistent and not at all enforced – another violation of China's regulations on direct selling.

## VII. **CLASS ACTION ALLEGATIONS**

62.     Plaintiffs are bringing a class-wide claim for California residents only to alter, change, amend, modify, and subtract all provisions of the Policies, Distributor Agreement, and Rewards Plan, such that these documents will be rescinded on a class-wide basis in Court. Plaintiffs also seek a class-wide injunctive relief California claim to modify the agreements and contractual relationship such that Jeunesse is prohibited from operating a business that relies primarily in California.

63.     Plaintiffs bring this action as a class action under Federal Rule of Civil Procedure 23.

64.     Plaintiffs seek to certify a class pursuant to Fed. R. Civ. Proc. 23(a), 23(b), 23(c)(4), and 23(c)(5), if necessary.

65.     Plaintiffs seek to represent a California class defined as follows: "All participants in Jeuneusse who registered in the State of California for whom the gross amounts paid to Jeunesse exceed the income paid by Jeunesse in commissions and bonuses."

66.     Excluded from the class are the Defendants, family members, this Court, any person who registered outside of the State of California, and any Diamond Distributor.

67.     Plaintiffs seek to pursue a private attorney general action for injunctive relief for themselves and all members of the class, and they satisfy the standing and class action requirements.

68. While the exact number of members in the Class are unknown to Plaintiffs at this time and can only be determined by appropriate discovery, membership in the class and subclasses is ascertainable based upon the records maintained by Defendant.

69. Therefore, the Class and Subclasses are so numerous that individual joinder of all Class and Subclass members is impracticable under Fed. R. Civ. P. 23(a)(1).

70. There are questions of law and/or fact common to the class and subclasses, including but not limited to:

      a. Whether Jeunesse is operating an endless chain as that is defined;

      b. Whether the participant received more than he/she paid.

71. These and other questions of law and/or fact are common to the class and subclasses and predominate over any question affecting only individual class members.

72. Plaintiffs' claims are typical of the claims of the class in that Plaintiffs were distributors for Defendant Jeunesse and lost money because of the illegal scheme, and each received false financial disclosures.

73. Plaintiffs will fairly and adequately represent the interests of the class and subclasses. Plaintiffs' claims are typical of those of the class and subclasses.

74. Plaintiffs' interests are fully aligned with those of the class and subclasses. And Plaintiffs have retained counsel experienced and skilled in complex class action litigation.

75. Class action treatment is superior to the alternatives for the fair and efficient adjudication of the controversy alleged, because such treatment will allow many similarly-situated persons to pursue their common claims in a single forum simultaneously, efficiently and without unnecessary duplication of evidence, effort, and expense that numerous individual actions would engender.

1    76.    Plaintiffs know of no difficulty likely to be encountered in the

2    management that would preclude its maintenance as a class action.

3

4    VIII.  **CAUSES OF ACTION**

5                    **FIRST CLAIM FOR RELIEF**

6    **ENDLESS CHAIN SCHEME; California Penal Code §327 and Section**

7                **1689.2 of the California Civil Code**

8    (Plaintiffs Xiong On Behalf of Themselves and on Behalf of all Classes against all

9                Defendants, including DOES 1 through 10)

10    77.    Plaintiffs reallege all allegations, and incorporates previous allegations

11    by reference.

12    78.    Section 1689.2 of the California Civil Code provides:

13

14    A participant in an endless chain scheme, as defined in Section 327 of
      the Penal Code, may rescind the contract upon which the scheme is
15    based, and may recover all consideration paid pursuant to the scheme,
      less any amounts paid or consideration provided to the participant
16    pursuant to the scheme.

17    79.    Defendant Jeunesse is operating an endless chain scheme.

18    80.    Defendant Hui is operating the endless chain, and making

19    representations thereunder.

20    81.    Plaintiffs and the class have suffered an injury in fact and have lost

21    money or property because of Jeunesse's operation of an endless chain, business

22    acts, omissions, and practices.

23    82.    Plaintiffs seek to alter, change, amend, modify, and subtract all

24    provisions of the Policies, Distributor Agreement, and Rewards Plan.

25    83.    Plaintiffs and the class are entitled to:

26

27

28

a.     rescind the contract upon which the scheme is based and recover all consideration paid under the scheme, less any amounts paid or consideration provided to the participant under the scheme;

b.     restitution, compensatory and consequential damages (where not inconsistent with their request for rescission or restitution); and

c.     attorneys' fees, costs, pre- and post-judgment interest.

## SECOND CLAIM FOR RELIEF

**Unfair and Deceptive Practices Claims Under Cal. Bus, & Prof. Code § 17200,
*et seq.***

Against All Defendants, including DOES 1 to 10

(On Behalf of the Class)

84.     Plaintiffs reallege all allegations, and incorporate previous allegations by reference.

85.     All claims brought under this Second Cause of action that refer or relate to the unlawful, fraudulent or unfair "endless chain" of Defendants are brought on behalf of Plaintiffs and the Class.

86.     All claims brought under this Second Cause of Action that refer or relate to the unlawful, fraudulent or unfair the statements, the touted Jeunesse "business opportunity" are brought on behalf of Plaintiffs and the Subclasses.

87.     Jeunesse has engaged in constant and continuous unlawful, fraudulent and unfair business acts or practices, and unfair, deceptive, false and misleading advertising within the meaning of the California Business and Professions Code § 17200, et seq. The acts or practices alleged constitute a pattern of behavior, pursued as a wrongful business practice that has victimized and continues to victimize thousands of consumers. The Jeunesse sales and marketing plan is unlawful.

88.     Under California Business and Professions Code § 17200, an "unlawful" business practice is one that violates California law.

89. Jeunesse's business practices are unlawful under § 17200 because they constitute an illegal "endless chain" as defined under, and prohibited by, California Penal Code § 327.

90. Jeunesse utilizes its illegal "endless chain" with the intent, directly or indirectly, to dispose of property in Jeunesse products and to convince distributors to recruit others to do the same.

91. Jeunesse's business practices are unlawful §17200 because they violate §17500 *et seq.*, as alleged in the Third Cause of Action.

92. Under California Business and Professions Code § 17200, a "fraudulent" business practice is one that is likely to deceive the public.

93. Jeunesse's business practices are fraudulent in four separately actionable ways: (1) Jeunesse's illegal and deceptive "endless chain;" (2) the touted, yet non-existent, Jeunesse "business opportunity" for everyone, including but not limited to Jeunesse's massive advertising campaign and the misleading statements of compensation.

94. First, as detailed herein, Defendants promoted participation in the Jeunesse endless chain, which has a compensation program based on payments to participants for the purchase of product by participants, not the retail sale of products or services.

95. Jeunesse has made numerous misleading representations about the business opportunity of Jeunesse and the income that a recruit or a distributor can realize by becoming a distributor and participating in the scheme.

96. Jeunesse knew, or should have known, that the representations about the business opportunity of Jeunesse were misleading in nature.

97. As a direct result of Jeunesse's fraudulent representations and omissions regarding the Jeunesse endless chain described herein, Jeunesse wrongly acquired money from Plaintiffs and the members of the classes.

98.    Second, Jeunesse touted, in numerous different ways as part of a massive advertising campaign, a "business opportunity," which Jeunesse also repeatedly and in many ways represented, among other things, as being "for everyone" and allowing "full time" or "part time" opportunities.

99.    The massive advertising campaign included among other things, the website, emails, websites, presentations by Jeunesse, training, word of mouth among distributors, television, radio, and events.

100.    As part of this campaign and a further inducement to potential distributors, Jeunesse made and disseminated statements of compensation that further misled the public, among other things: (1) by using cryptic and technical terms known to Jeunesse but not to the general public or to those exploring the claimed "business opportunity," (2) by highlighting the "winners," i.e., those that received compensation from Jeunesse, and the average gross compensation paid by Jeunesse to those winners, (3) by failing to disclose the actual number of "winners" as compared to the number of distributors who received no compensation from Jeunesse (i.e., the "losers"); and (4) by downplaying and omitting the risks and costs involved in starting an Jeunesse distributorship and succeeding in such a distributorship.

101.    In reality, the touted "business opportunity" was only for a select few, and those that were recruited specially. And these numbers did not include expenses incurred by distributors in the operation or promotion of their businesses, meaning there were likely more net losers who made no profit at all.

102.    Jeunesse knew, or should have known, that the selective information presented to distributors in the compensation package, the Income Disclosures, and its massive adverting campaign during that time frame touting its purported "business opportunity" was likely to mislead the public and did in fact mislead the public into believing there was a legitimate "business opportunity" in which distributors, or a large portion of them, could make money in either a full or part

time capacity. In fact, however, there was no such "business opportunity," except for a very select few.

103. As a direct result of Jeunesse's fraudulent representations and omissions regarding the Statement and the massive adverting campaign during that time frame and thereafter touting Jeunesse's purported "business opportunity" described herein, Jeunesse wrongly acquired money from Plaintiffs and the members of the Class/subclasses.

104. Plaintiffs and the class purchased Jeunesse products and were charged a significant flat shipping fee.

105. Jeunesse knew, or should have known, that the misrepresentations and omissions about the handling fees were likely to mislead the public and its distributors.

106. As a direct result of Jeunesse's fraudulent representations and omissions regarding the purported handling fees described herein, Jeunesse wrongly acquired money from Plaintiffs and the members of the classes.

107. The named Plaintiffs have standing to bring these Section 17200 claims under the fraudulent prong and can demonstrate actual reliance on the alleged fraudulent conduct.

108. For instance, Plaintiffs received the IBP or mini-IBP, which promoted the Jeunesse Scheme and claimed "business opportunity" and contained material false representations regarding the success distributors could achieve through Jeunesse by purchasing products and recruiting others to do the same.

109. There were other representations made to distributors as part of the massive advertising campaign regarding the claimed "business opportunity," on which Plaintiffs or some of them, reasonably believed the representations they could succeed in the "business opportunity," did not return the refund, purchased Jeunesse products and did not immediately return them, signed up as Jeunesse distributors,

and attempted to and recruited others to do the same. These other representations include, but are not limited to the following:

a. Emails from Jeunesse that promoted Jeunesse and contained material false representations regarding the success that a distributor could achieve through Jeunesse by purchasing products and recruiting others to do the same.

b. Websites, such as Jeunesse's own website, which promoted the fraudulent scheme through videos of Diamond distributors containing material false representations regarding the "business opportunity" available to distributors and the wealth that a distributor could get by agreeing to become an Jeunesse distributor.

c. Presentations by Jeunesse distributors which contained material false representations regarding the "business opportunity" and the success that a distributor could get through Jeunesse by purchasing products and recruiting others to do the same.

d. Presentations by Jeunesse, including the presentations described in this complaint, which contained material false representations regarding the "business opportunity" and the success that a distributor could get through Jeunesse by purchasing products and recruiting others to do the same.

e. Training and events, such as the Extravaganza as described in this complaint, where Jeunesse distributors made material false representations regarding the "business opportunity" and the success that a distributor could get through Jeunesse by purchasing products and recruiting others to do the same.

110. To the extent proof of reliance is required of Plaintiffs, Jeunesse and the Diamond Distributors knew that Plaintiffs and the class would reasonably rely on their representations and omissions, which would cause the Plaintiffs and the class joining the fraudulent endless chain scheme and purchasing the products, and Plaintiffs did in fact reasonably rely upon such representations and omissions.

111. Indeed, had Plaintiffs and the class known that Jeunesse and its Diamond Distributors were promoting an endless chain, they would not have

become Jeunesse distributors in the first place and, if learned after becoming a distributor, they would not have purchased Jeunesse products thereafter.

112. Had Plaintiffs and the class known that Jeunesse was promoting a "business opportunity" that did not exist except for a select few, they would not have become Jeunesse distributors in the first place and, if learned after becoming a distributor, they would not have purchased Jeunesse products thereafter.

113. Finally, the fraudulent acts, representations and omissions described herein were material not only to Plaintiffs and the class (as described in this complaint), but also to reasonable persons. For instance, regarding the alleged "business opportunity" and representations in, and omissions from, the Income Disclosures (and prior disclosures thereto), and on information and belief, a large percentage of individuals who signed up as Jeunesse distributors during this time frame expected that they could and would receive annual compensation at the approximate level of the "average earnings compensation," in total, disclosed in the Statements of Average Gross Compensation. Unfortunately, no such large percentage actually could or did earn such an amount.

114. Under California Business and Professions Code § 17200, a business practice is "unfair" if it violates established public policy or if it is immoral, unethical, oppressive or unscrupulous and causes injury which outweighs its benefits.

115. For the reasons set forth herein and above, Jeunesse's promotion and operation of an unlawful and fraudulent endless chain, and its fraudulent representations and omissions regarding its purported "business opportunity," are also unethical, oppressive, and unscrupulous in that Jeunesse is and has been duping Plaintiffs and the class out of billions, or at least hundreds of millions, of dollars.

116. Jeunesse's actions have few, if any, benefits. Thus, the injury caused to Plaintiffs and the class easily and dramatically outweighs the benefits, if any.

117. Defendants should be made to disgorge all ill-gotten gains and return to Plaintiffs and the class all wrongfully taken amounts.

118. Finally, Defendants' unlawful, fraudulent and unfair acts and omissions will not be completely and finally stopped without orders of an injunctive nature. Under California Business and Professions Code section 17203, Plaintiffs and the class seek a judicial order of an equitable nature against all Defendants, including, but not limited to, an order declaring such practices as complained of to be unlawful, fraudulent and unfair, and enjoining them from further undertaking any of the unlawful, fraudulent and unfair acts or omissions described herein.

## THIRD CLAIM FOR RELIEF

### False Advertising

(California Business and Professions Code § 17500, et seq.)

(On Behalf of the Class, and All Subclasses)

Against All Defendants, including Does 1 to 10

119. Plaintiffs reallege all allegations, and incorporate previous allegations by reference.

120. All claims brought under this Third Claim for Relief that refer or relate to the false, untrue, fraudulent or misleading endless chain of Defendants are brought on behalf of Plaintiffs and the Class.

121. All claims brought under this Third Cause of Action that refer or relate to the false, untrue, fraudulent or misleading Income Disclosures of Average Gross Compensation and the touted Jeunesse "business opportunity" are brought on behalf of Plaintiffs and the sub-class

122. Defendants' business acts, false advertisements and materially misleading omissions constitute false advertising, in violation of the California Business and Professions Code § 17500, *et seq*.

123. Defendants engaged in false, unfair and misleading business practices, consisting of false advertising and materially misleading omissions regarding the

purported "business opportunity," likely to deceive the public and include, but are not limited to, the items set forth above. Jeunesse knew, or should have known, that the representations about the business opportunity of Jeunesse were misleading in nature.

124. Because of Defendants' untrue and/or misleading representations, Defendants wrongfully acquired money from Plaintiffs and the class members to which they was not entitled. The Court should order Defendants to disgorge, for the benefit of Plaintiffs and all other Jeunesse distributors in the class who signed an agreement with Jeunesse governed by California law their profits and compensation and/or make restitution to Plaintiffs and the class.

125. Because of Defendants' untrue and/or misleading representations, Defendants wrongfully acquired money from Plaintiffs and the class members to which it was not entitled. The Court should order Defendants to disgorge, for the benefit of Plaintiffs and all other Jeunesse distributors in the class who signed a Distributor Agreement with Jeunesse governed by California law their profits and compensation and/or make restitution to Plaintiffs and the class.

126. Under California Business and Professions Code Section 17535, Plaintiffs and the class seek a judicial order directing Defendants to cease and desist from all false advertising related to the Defendants' illegal e scheme, shipping charges, false claims regarding the Defendants' products' efficacy, and such other injunctive relief as the Court finds just and appropriate.

## FOURTH CLAIM FOR RELIEF

### THE PRIVATE ATTORNEYS GENERAL ACT LABOR CODE VIOLATIONS ARISING FROM MISCLASSIFICATION (California Labor Code § 2698 *et seq*.)

(Plaintiffs on behalf of herself and the Class Against All Defendants including DOES 1 through 10)

127. Plaintiffs re-allege and incorporate by reference the allegations

contained in the paragraphs above as if fully set forth herein.

128. Plaintiffs are each "aggrieved employees" under PAGA, as they were employed by Jeunesse during the applicable statutory period and suffered one or more of the Labor Code violations set forth herein. Accordingly, each of them seeks to recover on behalf of themselves and all other current and former aggrieved employees of Jeunesse, the civil penalties provided by PAGA, plus reasonable attorney's fees and costs.

129. Plaintiff Xiong seeks to recover the PAGA civil penalties through a representative action permitted by PAGA and the California Supreme Court in *Arias v. Superior Court* (2009) 46 Cal. 4th 969. Therefore, class certification of the PAGA claims is not required, but Plaintiffs Xiong may choose to seek certification of the PAGA claims.

130. Plaintiffs Xiong and all other current and former aggrieved employees of Jeunesse seek civil penalties pursuant to PAGA for violations of the following Labor Code provisions:

a. failure to provide prompt payment of wages to representative employees upon termination and resignation in violation of Labor Code §§ 201, 202, 203;

b. failure to provide itemized wage statements to representative employees in violation of Labor Code §§ 226(a), 1174, and 1174.5;

c. failure to provide meal and rest periods in violation of Wage Order No. 9 and Labor Code §§ 226.7, 512, and 558;

d. willfully misclassifying its representative employees in violation of Labor Code § 226.8;

e. failure to provide gratuities intended for representative employees in violation of Labor Code § 351;

f. failure to keep required payroll records in violation of Wage Order No. 9 and Labor Code §§ 1174 and 1174.5;

g.    failure to pay overtime wages in violation of Wage Order No. 9 and Labor Code §§ 510, 558, 1194 and 1198;

h.    failure to pay minimum wages in violation of Wage Order No. 9 and Labor Code §§ 1182.12, 1194, and 1197;

i.    failure to reimburse representative employees for all reasonably necessary expenditures and losses incurred by representative employees in direct consequence of the discharge of their duties, including but not limited to fuel, insurance, maintenance, and toll costs, in violation of Labor Code § 2802.

131.    With respect to violations of Labor Code § 226(a), Labor Code § 226.3 imposes a civil penalty in addition to any other penalty provided by law of two hundred fifty dollars ($250) per aggrieved employee for the first violation, and one thousand dollars ($1,000) per aggrieved employee for each subsequent violation of Labor Code § 226(a).

132.    With respect to violations of Labor Code §§ 510, 512, Labor Code § 558 imposes a civil penalty in addition to any other penalty provided by law of fifty dollars ($50) for initial violations for each underpaid employee for each pay period for which the employee was underpaid in addition to an amount sufficient to recover underpaid wages, and one hundred dollars ($100) for subsequent violations for each underpaid employee for each pay period for which the employee was underpaid in addition to an amount sufficient to recover underpaid wages. Moreover, Plaintiffs Xiong seeks civil penalties in the amount of unpaid wages owed to aggrieved employees pursuant to Labor Code § 558(a)(3).

133.    With respect to violations of Labor Code § 1174, Labor Code § 1174.5 imposes a civil penalty of $500.

134.    Labor Code § 2699 et seq. imposes a civil penalty of one hundred dollars ($100) per pay period, per aggrieved employee for initial violations, and two hundred dollars ($200) pay period, per aggrieved employee for subsequent violations for all Labor Code provisions for which a civil penalty is not specifically

provided, including Labor Code §§ 226.7, 226.8, 1174, 1182.12, 1194, 1197, 1198, and 2802.

## **PRAYER FOR RELIEF**

The named Plaintiffs and the Plaintiff class and subclasses request the following relief:

a. Certification of the class and subclasses;

b. A jury trial and judgment against Defendants;

c. Rescission of the agreements upon which the scheme is based, and recovery of all consideration paid pursuant to the scheme, less any amounts paid or consideration provided to the participant pursuant to the scheme;

d. Damages for the financial losses incurred by Plaintiffs and by the class and subclasses because of the Jeunesse Defendants' conduct and for injury to their business and property;

e. Restitution and disgorgement of monies;

f. Temporary and permanent injunctive relief enjoining Jeunesse from paying its Distributors recruiting rewards that are unrelated to retail sales to ultimate users and from further unfair, unlawful, fraudulent and/or deceptive acts;

g. The cost of suit including reasonable attorneys' fees under California Code of Civil Procedure § 1021.5, Civil Code §1689.2, and otherwise by law.

h. For damages in an amount yet to be ascertained as allowed by law; and

i. For such other damages, relief and pre- and post-judgment interest as the Court may deem just and proper.

LINDEMANN LAW FIRM, APC

Dated: August 10, 2018      By: _____

BLAKE J. LINDEMANN, SBN 255747
433 N. Camden Drive, 4th Floor
Beverly Hills, CA 90210
Telephone: (310) 279-5269
Facsimile: (310) 300-0267

Attorneys For Plaintiff
HELEN XIONG AND THOSE SIMILARLY SITUATED

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

ORIGINAL CLASS ACTION COMPLAINT

## DEMAND FOR JURY TRIAL

Plaintiff Helen Xiong, on behalf of herself and those similarly situated, hereby demand a jury trial on all matters so triable.

**LINDEMANN LAW FIRM, APC**

Dated: August 10, 2018          By: _____

BLAKE J. LINDEMANN, SBN 255747
433 N. Camden Drive, 4th Floor
Beverly Hills, CA 90210
Telephone: (310) 279-5269
Facsimile: (310) 300-0267

Attorneys For Plaintiff
HELEN XIONG AND THOSE SIMILARLY SITUATED